**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

EDWARD BOLICH,             :       Civil No.  3:24-CV-581
                                      :
       **Plaintiff,**           :
                                        :
    **v.**                         :       **(Magistrate Judge Carlson)**
                                        :
**MARTIN O'MALLEY,**          :
**Commissioner of Social Security**    :
                                        :
       **Defendant.**         :

## MEMORANDUM OPINION

### I.    Introduction

In this case, the plaintiff, Edward Bolich, appeals an adverse disability

determination made by a Social Security Administrative Law Judge (ALJ),

contending that this decision should be reversed because substantial evidence does

not support the ALJ's conclusion that Bolich was not wholly disabled. In considering

this issue the Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,

305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case, Bolich claimed that he was totally disabled due to degenerative joint disease of the left knee, lumbar spine fractures, degenerative disc disease of the thoracic spine and lumbar spine, dextroscoliosis, and obesity. (Tr. 19). These conditions were apparently exacerbated following a drunk driving accident in which Bolich struck a parked car. (Tr. 25). However, the clinical evidence presented to the ALJ regarding the severity of Bolich's orthopedic impairments was mixed and equivocal. Moreover, much of this clinical evidence supported the view that Bolich could perform some work. Furthermore, the medical experts who examined Bolich's clinical history agreed that he was capable of performing light work with some postural limitations but disagreed regarding the extent of those postural limits. Based upon this body of evidence, which generally supported a finding that Bolich was

2

physically able to perform some light work, the ALJ denied Bolich's disability claim.

This appeal followed. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

II.  **<u>Statement of Facts and of the Case</u>**

A. **<u>Background</u>**

The administrative record of Bolich's disability application reveals the following essential facts: On February 9, 2022, Bolich applied for disability and disability insurance benefits pursuant to Title II of the Social Security Act, alleging an onset of disability beginning November 1, 2017, an onset date which was later amended to August 2020. (Tr. 17). According to Bolich, he was completely disabled due to the combined effects of degenerative joint disease of the left knee, lumbar spine fractures, degenerative disc disease of the thoracic spine and lumbar spine, dextroscoliosis and obesity. (Tr. 19). These conditions had reportedly been

aggravated by a March 3, 2020, accident in which Bolich hit a stopped car while he was intoxicated and did not remember the event. (Tr. 25).

Bolich was born on August 15, 1970, and was 52 years old on the date last insured, which is defined as an individual closely approaching advanced age under the Commissioner's regulations. (Tr. 30). He has a high school education and previously worked as a caseworker and resident supervisor. (Id.)

## B. **Clinical Record, Bolich's Impairments**

While Bolich alleged an onset of disability beginning in August 2020, following his drunk driving accident, the ALJ took a broader longitudinal perspective in evaluating the clinical evidence. With respect to Bolich's physical impairments, the clinical record was aptly summarized by the ALJ, in the following terms:

> [The] relevant past medical evidence contains an x-ray of the left knee from January 19, 2017 that found tricompartmental degenerative changes (Exhibit 1F, Pgs. 7-9). In addition, prior treatment records from 2019 note right sciatica and lumbar disc disorder with radiculopathy and show treatment with a muscle relaxant medication (Exhibits 2F, Pg. 3 and 3F, Pg. 9). An MRI of the thoracic spine dated September 11, 2019 showed multilevel degenerative changes of the thoracic spine with abnormal high STIR signal representing inflammatory degenerative changes and a posterior disc osteophyte complex which deforms the spinal cord with moderate central canal stenosis at the T11-12 level. (Exhibit 5F, Pgs. 2-4). An MRI of the lumbar spine from September 11, 2019 showed fractures of the right L4 and L1 transverse process, inflammatory degenerative changes at the T12-L1 and L4-5

4

levels and similar disc osteophyte complexes at L3-4 through L5-S1 with severe left neural foraminal-stenosis at L3-4 and L4-5 and severe right neural foraminal stenosis at L5-S1 with right lateral recess stenosis at S1 (Exhibit 5F, Pgs. 5-7). However, the prior records show that as later as September 9, 2019, the claimant passed an employment physical to begin work as a substitute teacher. Physical examination findings from this date indicate the claimant had a slow limping gait but did not use an assistive device. The claimant had positive straight leg-raise testing, but no instability in the upper and lower extremities, good mobility in all extremities and normal Achilles and patellar reflexes (Exhibit 4F, Pgs. 1-3).

Treatment records in 2020 detail a motor vehicle accident on March 3, 2020 during which the claimant hit a stopped car while he was intoxicated on alcohol and did not remember the event. (Exhibit 7F, Pg. 5). Diagnostic testing of the thoracic-lumbar spine after this accident indicated age-indeterminate, likely old fractures, of L1 and L3 right transverse processes, old, healed fractures of L2, L4, and L5 right transverse processes, likely chronic loss of heights/fractures of multiple thoracic and lumbar vertebrae, extensive paravertebral ossifications/osteophytes and fusion with discontinuity at multiple levels, severe degenerative changes and severe dextroscoliosis (Exhibit 7F, Pg. 10). These records also note Class I obesity with a height and weight in the range for a body mass index of 30.0-34.9 (Exhibit 7F, Pg. 29). Physical examination findings noted the claimant's range of motion appears with be within normal limits. In terms of complete treatment at this admission, the claimant signed out against medical advice (Exhibit 7F, Pgs. 20 and 52).

The record next shows treatment establishing as a new patient with a primary care provider on August 27, 2021. These records include a finding of low back pain as reported by the claimant. Objective physical examination findings from this visit indicate the claimant walked with a normal gait with intact motor strength in the upper and lower extremities (Exhibit 9F, Pgs. 12- 13). Treatment records from the primary care provider throughout the remainder 2021 note a normal gait and intact muscle strength in the upper and lower extremities (Exhibit

9F, Pgs. 17 and 20). On January 19, 2022, the claimant reported having low back pain but continued with similar clinical findings. These records show the claimant was referred for pain management (Exhibit 9F, Pgs. 21 and 23).

The record shows the claimant had pain management treatment on January 31, 2022. At this examination, the claimant was noted as walking in a flexed position with thoralumbar scoliosis to the right, diminished sensation in the L5 distribution bilaterally and absent Achilles and patellar reflexes. These records indicate that the claimant should try physical therapy, even though he was not optimistic it would help him and get updated MRI testing due to the reported worsening of his symptoms (Exhibit 8F, Pgs. 5-6). The record shows the claimant obtained an updated MRI of the lumbar spine on March 1, 2022 that showed marrow edema involving he right endplate of L3 and suggestion of edema at L2, dextro sclerotic curvature and reversal of the expected lumbar lordosis, multilevel degenerative changes, stable severe spinal stenosis at L4- L5, stable right paracentral disc protrusion at L5-S1, impinging the right S1 nerve root, neural foraminal narrowing at multiple levels with abutment on the exiting left L4 nerve root and the exiting right L5 nerve root (Exhibit 8F, Pgs. 25-26).

The record shows the claimant had a physical therapy evaluation on February 7, 2022 and was noted to have excellent rehab potential (Exhibit 8F, Pgs. 36-39). However, records from March 3, 2022 note the physical therapy was not helping and injections were scheduled along with a prescription for a muscle relaxer. The record shows the claimant had bilateral epidural steroid injections at the L4 and L5 levels on March 25, 2022 and afterward reported 80-90% improvement in leg symptoms and 30% improvement in low back pain with standing and walking (Exhibits 8F, Pgs. 45-48 and 10F, Pgs. 8, 11 and 13-14). Treatment records from the primary care provider dated June 21, 2022 find the claimant was walking with a normal gait and had intact strength in the upper and lower extremities (Exhibit 11F, Pg. 19). The record shows the claimant returned to pain management on June 27, 2022 and reported having intermittent right lower extremity weakness and numbness. On examination, the claimant was noted to have an antalgic

gait and diminished sensation to pinprick in the right L4-L5-S1 distribution for which epidural steroid injections were recommended (Exhibit 10F, Pgs. 6-7). However, there is no indication the claimant received additional injections and he testified he only received them one time. Treatment records from the primary care provider dated October 3, 2021 show physical examination findings of normal gait for age and intact strength in the upper and lower extremities. These records also note an increased body mass index and a finding of morbid obesity (Exhibit 15F, Pgs. 5-6). Similarly, treatment records from the primary care provider from January 6, 2023 find normal gait for age and intact strength in the upper and lower extremities. Additionally, despite the claimant's level of obesity, the findings note normal respiration, normal heartrate, no edema and soft and non-distended abdomen (Exhibit 15F, Pg. 10).

(Tr. 25-26).

The ALJ also considered the results of a 2022 consultative examination of

Bolich, noting:

In addition to the treatment records, the claimant had a physical consultative examination performed by Dr. Monfared on October 31, 2022 (Exhibit 13F). At this examination, the claimant appeared with a cane, but his gait was found to be normal with and without a cane (Emphasis added). The claimant did have problems with walking on heels and toes and performed less than 50% squat. The claimant also needed no help getting on and off the examination table and rising from a chair. The claimant was observed to have mild scoliosis and mild kyphosis. The claimant had positive straight leg-raise testing on the right but no radicular pain pattern noted. The claimant had reduced range of motion in the right hip and knee and lumbar spine. The claimant also had reduced range of motion in the shoulders but not in the cervical spine. The claimant had normal reflexes and no sensory deficit in the upper and lower extremities, no edema and normal pulses. The claimant had slightly reduced strength (4 out of 5) in the upper

7

extremities, 4/5 strength in the right lower extremity and full strength
(5 out of 5) in the left lower extremity (Exhibit 13F).

(Id.)

Thus, with respect to Bolich's physical impairments, the clinical evidence was
equivocal. The treatment records confirmed the existence of Bolich's orthopedic
ailments, but also noted instances in which his gait was normal, he displayed strength
in his extremities, and he reported pain relief through a relatively conservative
course of treatment.

## C. **The Expert Opinion Evidence**

Given this clinical picture, three medical experts opined on the severity of
Bolich's physical impairments. Notably, none of these experts were treating
physicians. Thus, no treating source opined that Bolich's impairments were
disabling. With respect to exertional limitations found by the state agency and
consulting experts, there was a consensus among these medical professionals. Two
State agency experts and a consultative examiner all agreed that Bolich could
perform some range of light exertional work. (Tr. 72-79, 81-90, 706-15). The experts
differed somewhat, however, in their evaluation of Bolich's postural limitations,
with the greater weight of the expert opinion evidence finding that these postural
limitations were not disabling.

At the outset, on October 31, 2022, Dr. Ziba Monfared prepared a consultative examination report relating to Bolich. (Tr. 706-15). In this report Dr. Monfared concluded that Bolich could lift and carry up to twenty pounds occasionally; could occasionally reach, push and pull, and operate foot controls; and could frequently engage in fine manual manipulation. (Tr. 710, 712). Dr. Monfared found, however, that Bolich suffered from severe postural limitations that required the use of a cane to ambulate and limited him to less than eight hours of sitting, standing, and walking during the workday. (Tr. 711). Yet, with respect to these postural limitations, there was an internal inconsistency between the doctor's opinion and his clinical findings which noted, in part, that Bolich's gait was normal with and without the cane. Further while Dr. Monfared observed that Bolich seemed unable to walk on heels and toes and tandem walk, the doctor also found that his stance was normal; he did not request assistance changing for the exam; he was able to change into a gown by himself; he needed no help getting on and off the exam table; and he was able to rise from a chair without difficulty. (Tr. 707).

Two State agency experts then opined regarding the severity of Bolich's impairments. These experts agreed that Bolich could perform light exertional work but determined that Dr. Monfared's extreme postural limitations—which were inconsistent with his clinical observations—overstated the degree of his disability.

9

(Tr. 72-79, 81-90). Notably, the second of these two opinions was rendered after Dr. Monfared completed his examination, and took into account those examination results, but found them to be inconsistent with the clinical evidence. (Tr. 81-90).

It was against this medical background that Bolich's case came to be considered by the ALJ.

### D. **The ALJ Decision**

A disability hearing was conducted in Bolich's case on March 21, 2023, at which Bolich and a vocational expert testified. (Tr. 37-70). Following this hearing, on May 26, 2023, the ALJ issued a decision in Bolich's case. (Tr. 14-32). In that decision, the ALJ first concluded that Bolich met the insured requirements of the Act through December of 2022, and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Bolich had the following severe impairments: degenerative joint disease of the left knee, lumbar spine fractures, degenerative disc disease of the thoracic spine and lumbar spine, dextroscoliosis and obesity. (Id.)

At Step 3, the ALJ determined that Bolich did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 23). Between Steps 3 and 4, the ALJ then

fashioned a residual functional capacity ("RFC") for the plaintiff which considered

all of Bolich's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally perform pushing and/or pulling motions with the upper and lower extremities, such as operating levers, hand controls, pedals and foot controls. The claimant can occasionally stoop, kneel, crouch and use ramps and climb stairs. The claimant can perform jobs that do not require balancing, kneeling, crawling or climbing on ladders, ropes or scaffolding. The claimant can tolerate occasional exposure to vibration. The claimant can perform jobs that do not require exposure to workplace hazards, such as unprotected heights and dangerous, moving machinery.

(Id.)

In fashioning this RFC, the ALJ considered the medical evidence, the expert

opinions, and Bolich's self-described limitations. (Tr. 24-30). The ALJ first engaged

in a two-step process to evaluate Bolich's alleged symptoms, finding that, although

the claimant's medically determinable impairments could reasonably be expected to

cause his alleged symptoms, the plaintiff's statements concerning the intensity,

persistence, and limiting effects of those symptoms were not entirely consistent with

the medical evidence and other evidence in the record. (Id.)

In making this determination, the ALJ considered Bolich's statements and

testimony regarding his impairments and limitations, but contrasted these statements

against the medical records, which "contain[ed] numerous references to full muscle
strength in the upper and lower extremities and normal gait." (Tr. 28). The ALJ also
took into account Bolich's activities of daily living, noting that:

> In addition to the diagnostic and clinical evidence discussed above, the
> statements and activities of the claimant do not support greater
> limitations than provided in the above residual functional capacity. The
> claimant testified his doctor told him that he could manage his pain with
> injections for ten years and he should hold off on surgery until then.
> The claimant testified he does not want to take any pills. The claimant
> testified could lift and carry twenty pounds. The claimant testified he is
> able to dress, groom and feed himself. The claimant testified he can go
> in the store for ten minutes to get small grocery orders. The claimant
> testified he does some chores around the home and is able to clean up
> the garage for fifteen minutes. The claimant testified he no longer does
> yard work, such as raking leaves and shoveling snow. The claimant
> testified he reads books all day and watches television throughout the
> day. In addition, the claimant reported he is able to prepare simple
> meals, put laundry in the washer and dryer, operate a motor vehicle,
> shop using a computer, pay bills, count change, handle a savings and
> checking account and follow written and spoken instructions well
> (Exhibit 4E). While the undersigned did not place undue weight on any
> single activity and acknowledges that the claimant has some degree of
> limitations in performing activities of daily living, taken together with
> the above medical evidence of record, these activities suggest that the
> claimant can perform work within the above parameters. As such, the
> claimant's testimony is partially accepted because while it was candid
> and supports some limitations, it is not entirely consistent with the level
> of limitation alleged by the claimant or with the objective medical
> evidence as discussed above.

(Id.)

Finally, the ALJ assigned greater persuasive power to the two opinions of the State agency experts, reasoning that the extreme postural limitations described by Dr. Monfared were inconsistent with his own clinical observations, which included a finding that Bolich walked with a normal gait with or without the use of a cane. (Tr. 27).

Having made these findings, the ALJ concluded that Bolich could both perform his past relevant work and could do other jobs which existed in significant numbers in the national economy. (Tr. 30-31). Therefore, the ALJ found that Bolich had not met the exacting standard for disability prescribed by law and denied this claim. (Tr. 32).

This appeal followed. (Doc. 1). On appeal, Bolich advances a general argument that the ALJ's decision was not supported by substantial evidence. However, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A.    <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also <u>Wright v.</u>

15

Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

17

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations

that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C.   **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Bolich retained the residual functional capacity to perform a range of light work. Therefore, we will affirm this decision.

On appeal, Bolich simply lodges a general objection to the ALJ's decision, insisting that this ruling is not supported by substantial evidence. While this argument is broadly cast by the plaintiff, at bottom, it appears that Bolich invites us to re-weigh the evidence and find that he is disabled.

This we may not do. Rather, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). Thus, our inquiry is not whether *some* evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether *substantial* evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

In this case, substantial evidence; that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Pierce, 487 U.S. at 565, supported the ALJ determination that Bolich was not totally disabled. Indeed, the relatively conservative clinical treatment record, Bolich's activities of daily living and the greater number of medical opinions all supported the conclusion that Bolich could perform a range of light work.

Nor can Bolich prevail by arguing that the ALJ erred in failing to adopt the extreme postural restrictions proposed by the consulting physician, Dr. Monfared. On this score, our review of this case is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. After the paradigm shift in in the manner in which medical opinions are evaluated when

assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." <u>Andrew G. v. Comm'r of Soc. Sec.</u> at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, in evaluating the persuasiveness of medical opinions the ALJ may discount an opinion when it conflicts with other objective tests or examination results. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the doctor's actual clinical observations, justifies deeming a medical source opinion unpersuasive. <u>Torres v. Barnhart</u>, 139 F. App'x 411, 415 (3d Cir. 2005).

That is what took place here. In evaluating the persuasiveness of Dr. Monfared's opinion the ALJ noted that during this examination: "the claimant appeared with a cane, <u>but his gait was found to be normal with and without a cane</u>." (Tr. 26) (emphasis in original). Contrasting Dr. Monfared's opinion concerning

Bolich's postural limitations against the entire medical record the ALJ concluded that:

> The undersigned did not find this opinion persuasive because it was based on a one-time examination that contained physical deficits that were not found in the treatment records, such as cane use, reduced strength in the upper extremities and right lower extremity. This examination also relied on pain management records and did not look at the records from the primary care provider which consistently noted normal gait and full muscle strength in the upper and lower extremities, as well as no use of a cane (Exhibit 9F, Pgs. 12-13). The level of environmental and postural limitations is not well explained as it lists "same" as a reason, referring to lumbar radiculopathy and bilateral lower extremity weakness, but this was only slight on the right and full on the left. In addition, this opinion is not consistent with the level of treatment received by the claimant, as he has had only one set of injections and did not return for more, has no emergency treatment for pain and has not had a surgical consultation related to the extreme allegations regarding the limitations related to the spine. As such, this opinion was not persuasive when forming the residual functional capacity.

(Tr. 27). Simply put, this analysis which found Dr. Monfared's opinion to be unpersuasive drew support from significant and substantial evidence in the medical record, including Dr. Monfared's own report of this examination. There was no error here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus,

notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: October 9, 2024